## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**MICHAEL BELL**                                    **CIVIL ACTION**

**VERSUS**                                          **NO. 13-6265-SM-SS**

**CAROLYN W. COLVIN, ACTING**
**COMMISSIONER OF THE SOCIAL**
**SECURITY ADMINISTRATION**

### REPORT AND RECOMMENDATION

The plaintiff, Michael Bell ("Bell"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, as well as his claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).

### PROCEDURAL HISTORY

In 2009, Bell submitted applications for disability benefits. R. 246-255. They were denied. The ALJ issued an unfavorable decision on August 27, 2010. R. 50-63.

On December 27, 2011, the Appeals Council remanded the decision to the ALJ because: (1) new and material evidence relating to possible mental impairments was received; and (2) the hearing decision did not contain an adequate evaluation of Bell's alleged illiteracy. R. 86-90. After a hearing on May 2, 2012 (R. 8-20), the ALJ issued an unfavorable decision. R. 91-115. On August 22, 2013, the Appeals Council denied Bell's request for review. R. 1-7.

On October 25, 2013, Bell filed a complaint in federal court. Rec. doc. 1. The parties submitted cross-motions for summary judgment. Rec. docs. 12 and 13. Bell submitted a response to the Commissioner's motion. Rec. doc. 15.

## STATEMENT OF ISSUES ON APPEAL

Issue No. 1.    Whether substantial evidence supports the finding that Bell has past work as a boat pilot and therefore is not mentally retarded or illiterate?

Issue No. 2.    Whether substantial evidence supports the finding that Bell does not meet Listing 12.05 C for mental retardation?

Issue No. 3.    Did the ALJ err by failing to include non-exertional limitations in the residual functional capacity ("RFC") and by failing to obtain vocational expert testimony concerning non-exertional limitations?

Issue No. 4.    Did the ALJ err in finding that Bell had the RFC to perform the full range of medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c)?

Issue No. 5.    Whether Grid Rule 203.18 directs a finding of not disabled?

## THE COMMISSIONER'S FINDINGS

The ALJ made the following findings:

1.   Bell met the insured status requirements of the Act through December 31, 2011.

2.   Bell has not engaged in substantial gainful activity since July 1, 2009, the alleged onset date (20 C.F.R. §§ 404.1571 et seq., and 416.971 et seq.).

3.   Bell has the following severe impairment:  Degenerative Disc Disease (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  This is a severe impairment within the meaning of Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985), and the Regulations.

4.   Bell does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   Bell has the RFC to perform the full range of medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c).

2

6. Bell is capable of performing past relevant work as a tugboat driver (boat pilot), as he actually performed it. This work does not require the performance of work-related activities precluded by Bell's RFC (20 C.F.R. §§ 404.1565 and 416.965).

7. Bell has not been under a disability, as defined in the Act, from July 1, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

R. 97-107.

## ANALYSIS

a. **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited

function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).   Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez v. Barnhart, 415 F.3d at 461; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).  When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.  "In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history."  Perez v. Barnhart, 415 F.3d at 462.  "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

b.    **Testimony at the August 25, 2010 Hearing.**

Present at the hearing were Bell, his counsel, and a vocational expert.  R. 21.  Bell's counsel reported that the amended onset date was June 29, 2009 which was the last day he worked.  R. 27.

At the time of the hearing, Bell was 49 years old.  R. 24.  He received social promotions through the seventh or eighth grade.  R. 26.  He went to Southeastern Louisiana Hospital for help learning to read.  R. 26.  He described his ability to read as "very, very little."  R. 29.  He could

---

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

not spell.  R. 29.  If he was given written instructions, he had to have someone else explain the instructions to him.  R. 29.

Bell had a driver's license.  R. 32.  He got it when he was 15 years old.  Someone read the test to him.  Since then he kept the license up.  He never took another test.  R. 45.  He did not drive when he was on medication.  R. 32.  He only wore glasses to be able to see up close and did not require them for distance.  R. 32.

He was employed by Pearl River Navigation.  R. 25.  Bell drove a boat (similar to a tug boat) pushing barges around a shipyard.  He did painting and other things as well.  R. 25.  He began doing that type of work when he was 18 years old.  R. 25.  He never had a license to drive the boat.  R. 34 and 37.  He got the job because he had worked as a laborer or deckhand.  He was moving stuff around the shipyard.  R. 34.  Some of the boats had steering wheels.  Some of them had sticks that were used to operate the boat.  R. 34.  He only drove them around the yard.  R. 35.  He navigated by sight.  R. 35.

After September 11, 2001, he could not drive the boats because he did not have a license and could not obtain one.  R. 35.  After 9/11, he did things that did not require a license, like painting and helping to tie up the boat.  R. 36.  When he painted the boats, he used a brush and roller with oil-based paint.  He did not use a sprayer.  R. 36.  He painted the outside of the boats.  R. 37.  He stopped working when his neck gave him problems.  He could not be around people.  He could not read or write.  R. 25-26.  Bell last worked from January through June 2009.  R. 24 and 27.

Bell went to a psychiatrist about once a month.  He was taking medication and doing well with the psychiatrist.  R. 28.  He saw a counselor as well.  R. 28.  He saw another doctor for pain.

R. 28.  He had severe problems in his neck and lower back.  R. 29.  The doctor told him he would need surgery one day.  R. 31.  He took medication for his neck pain.  R. 31-32.

The pain in his neck limited his ability to perform physical activities.  R. 29.  Bell could not walk more than a couple of blocks before he had to sit down.  R. 29-30.  He could stand for no more than 30 to 40 minutes before he had to lean against a wall.  He could sit for no more than 30 to 40 minutes before he had to walk around.  R. 30.  He took pain medication for his neck and back.  R. 30.  It made him tired.  R. 30-31.  In a typical day, Bell walked a bit, lay on the couch, and sat down.  R. 31.  He could wash clothes.  R. 31. He could lift no more than about 10 to 20 pounds.  R. 31.  He did not go to church.  R. 31.  People that lived across the street helped him.  R. 45-46.

The vocational expert testified that a shipyard laborer was the DOT title that encompassed all of the activities Bell said he performed for the shipyard.  R. 38.  The DOT did not recognize a job title for a person operating a boat in an unlicensed capacity.  R. 38.  In a licensed capacity, the title is tugboat pilot or captain.  R. 38.

In response to the ALJ's hypothetical question (which did not include any restrictions for literacy), the expert testified that the person would not be able to perform Bell's past work.  R. 39.  Such a person (without literacy restrictions) could perform light duty jobs like cashier, rental counter clerk, and retail sales clerk.  R. 39-40.

The ALJ modified the hypothetical.  Among the restrictions was that the person retained the ability to read only somewhat.  The person could read short and uncomplicated instructions but not long and complicated instructions.  R. 40-41.  The expert testified that the physical profile was consistent with sedentary occupations because of the standing and walking

limitations.  Information clerk, escort vehicle driver and material mover would be available.  R. 41-42.  If the individual could not read at all, the available jobs would be eliminated.  R. 44.

c.      **Testimony at the May 2, 2012 Hearing.**

Present at the hearing were Bell, his counsel, and a vocational expert.  R. 8.  The vocational expert did not testify.  R. 9.

Bell was 51 at the time of the second hearing.  R. 11.  He completed the seventh grade, but had repeated the first, second and third grades. R. 11.  Bell testified that he did not learn how to read – "not enough to, like I could read maybe just a little bit but then if I get to something, I can't, I can't, I could pronounce it, I mean, I could never sound it out, never learned how to read."  R. 11.  In his prior jobs he never had to do any reading.  R. 11.  He relied on his co-workers to read for him.  R. 12.

Bell drove a boat, but was not licensed to operate a boat.  R. 12.  He could not pass the reading test required for the license.  R. 12.  He was not the captain of the boat.  R. 12.  He also worked to keep the boats clean.  R. 12.

Bell's memory and concentration were becoming worse.  R 12.  He remembered simple things sometimes.  R. 12-13.  He had memory problems every day. R. 13.  He was depressed.  R. 13.  He did not like to be around people.  R. 13.  He had anxiety and stress problems.  R. 14.

After he took a test, Bell was told that he was retarded.  R. 14.  He tried his best when he took the test.  R. 14.  He had problems answering the questions on the test.  R. 14.

Bell took care of his personal hygiene.  R. 14.  He did a little exercise and would lie down.  R. 14.  He spent most of a normal day lying down.  He would get up, do something and then lie back down.  R. 14 and 16.  His neighbors helped him get to the doctor.  R. 15.  His neighbor helped him get to the hearing.  R. 15.

Bell's back and neck problems were growing worse.  R. 15.  Accurate Clinic was providing him with treatment.  R. 15.  He took medication for these problems.  It helped, but he had pain every day.  R. 16.

Bell testified that he could not read the pain management agreement which he signed.  It was read to him.  He could sign his name.  R. 19.

Bell's attorney agreed with the ALJ's statement that there were no medical records indicating that Bell was unable to read.  R. 19-20.  The ALJ noted Dr. Kidder's evaluation where Bell was found to be illiterate.  R. 20.

d.    **Medical Evidence**.

Bell was seen at Axcess Medical Clinic in New Orleans from at least December 14, 2007 through June 26, 2009.  On December 14, 2007, James Chiberton, M.D., ordered an MRI for the cervical spine because of neck pain and left arm numbness off and on for a number of years.  R. 431, 569 and 593.  A January 3, 2008 MRI revealed moderate to severe spondylotic changes at C5-6 and milder spondylotic changes at C3-4.  The rest of the examination was unremarkable. R. 431 and 593.

On January 11, 2008, Bell reported pain in his neck (grinding of the neck bones).  R. 548. The onset was described as "old age."  R. 546.  He returned about once a month through June 26, 2009.[1]

On December 11, 2008, Bell's chief complaint was pain in his cervical spine.  Lorcet and Soma were prescribed for him.  He was alert and functional; he did not appear overly sedated; there were no indications of memory impairment; the medications were helpful; there was no

---

[1]  Bell was seen at Axcess Medical on February 28, 2008 (R. 544-45), March 7, 2008 (R. 542-43), April 4, 2008 (R. 540-41), May 2, 2008 (R. 538-39), May 31, 2008 (R. 536-37), June 27, 2008 (R. 534-35), July 25, 2008 (R. 531-33), August 22, 2008 (R. 528-30), September 18, 2008 (R. 525-27), October 16, 2008 (R. 522-24), November 13, 2008 (R. 519-21), December 11, 2008 (R. 516-18), January 8, 2009 (R. 513-15), February 5, 2009 (R. 510-12), March 6, 2009 (R. 507-09), April 2, 2009 (R. 504-06), May 1, 2009 (R. 501-03), May 29, 2009 (R. 498-500), and June 26, 2009 (R. 495-97).

evidence of substance abuse; and there were no new symptoms or decline in the function or qualify of his life.  The physician's handwritten notes indicated that Bell's chronic neck problem was stable.  The pain control was at 4 out of 10 (on January 11, 2008, the pain was 7 out of 10 [R. 549]).  R. 516.

Bell returned to work in January 2009 and stopped working in June.  R. 24.   The amended onset date is June 29, 2009.  R. 27.

On June 26, 2009, Bell returned to Axcess Medical.  R. 495-96.  He reported pain in his low back and neck.  Lorcet, Soma, Xanax, and Lisinopril were prescribed.  The diagnosis included chronic neck pain, anxiety, high blood pressure and spasms.  Non-pharmalogic treatments included warm baths, heating pad, exercise/stretching and rest.  R. 496.  His pain was ranging between 2 and 3 out of 10.  R. 497.

On July 29, 2009, Bell began going to Accurate Clinic in Kenner, Louisiana.  He went about once a month from July 2009 through April 3, 2012.

At the first visit on July 29, 2009, Bell reported neck and low back pain.  He was taking Lorcet, Soma and Xanax.  R. 433-36.  He described a stabbing pain in his low back and a throbbing pain in his neck.  R. 428.  His occupation was listed as a painter.  R. 432.  He reported that the pain derived from a 2005 motor vehicle accident.  R. 430.

On August 26, 2009, Bell's condition was stable.  He reported that Valium did not work as well as Xanax.  The neck pain was constant.  The low back pain was "okay" with pain management.  R. 426-27.  On September 23, Bell reported that Valium was not as effective as the Xanax.  He could sit for about 45 minutes before getting up.  With medication he was able to work.  R. 425.  On October 23, he reported some anxiety.  The neck pain was constant, but it was stable with the medication.  He was sleeping well.  R. 422-23.  On November 23, he reported

that he was doing "okay" with changes in the medication.  R. 420-21.  On December 21, he reported he was doing "okay."  He experienced nearly constant dull pain in his low back.  When he turned his neck, it felt like bones were rubbing together.  R. 418-19.

On January 25, 2010, he reported increased pain, but with medication he was able to sit longer and walk farther.  R. 416-17.  Bell returned to Axcess Medical Clinic in Picayune, Mississippi, for one visit on February 21, 2010.  R. 471-72.  On March 25, 2010, he was seen at Accurate Clinic.  He reported that he left Axcess Medical due to discomfort with the quality of care.  He had gone because it was closer to his home in Slidell.  R. 589.

On April 26, 2010, Bell was seen at Accurate Clinic.  He was doing well.  He was told to continue exercising.  R. 587.  On May 26, he was tolerating the tapering of his medication.  He was sleeping better with the change in his medication.  R. 585.  There was a treatment plan for his anxiety.  R. 611.  A June 24, ECG revealed sinus tachycardia (a heart rate that exceeds normal range).  R. 573.  Bell returned on June 25.  R. 583.

On July 26, 2010, Bell returned to Accurate Clinic with his neighbor, who reported that his anxiety was very easily triggered.  There were problems with social interaction and his daily routine.  R. 579.  Regarding his pain, he was able to do household chores at times.  R. 577.  On July 26, there was an office visit for anxiety (R. 579) and for pain (R. 577).  On August 25, he was seen for anxiety.  The anxiety was controlled with medication.  It was triggered by financial concerns.  R. 606-07.

On September 28, 2010, there were "two" office visits to Accurate Clinic.  One office visit was for pain.  Bell's condition was stable.  R. 640-41.  The second visit was for "Psych".  His condition was stable.  It was noted that he was doing "good".  R. 639.  The signature for the doctor and the "checkout signature" are the same for both visits.  See R. 638 and 640.  The

review of the symptoms for "each visit" is different.  For example, the "Pain" visit includes reference to radiation, numbness and weakness.  The "Psych" visit includes reference to the adequacy of sleep and the presence of depression.  R. 639 and 641.  September 28 marks the first appearance in the Accurate Clinic records for a "Psych" visit.

On October 20, 2010, there were Pain and Psych visits.  R. 634-37.  Bell was taking a powder and Advil for pain.  R. 637.  On November 19, Bell was described as illiterate.  It was noted that he was unable to read.  R. 631, 633.  There was an effort to have him evaluated at LSU.  R. 631.  On December 20, it was noted that he was unable to go to LSU.  R. 627.  The note for the Psych visit indicated that his anxiety was controlled.  R. 629.

On January 24, 2011, there were Pain and Psych visits.  R. 622-26.  Bell was able to stretch his medication for anxiety by reducing the dosage.  R. 625.  He was unable to go to LSU because he did not have a car.  R. 623.  Bell returned on February 23.  R. 726-30.  A psychosocial assessment was completed by a psychotherapist.  R. 726.  The anxiety was indicated as level three.  Its source was unknown.  He reported panic attacks about once every three months.  He was taking Valium and Xanax.  His condition was stable.  His support system included friends and family.  It was recommended that he maintain the taper of his medication.  The Anxiety portion of the Psychosocial Assessment was the only portion completed.  The portions for Pain, Depression and Substance Abuse were not completed.  R. 726.

On April 25, 2011, Bell reported that his anxiety and pain were controlled with medication.  R. 721-23.  On May 24, he reported that his anxiety was well controlled.  R. 720.  A psychosocial assessment was completed by a psychotherapist for Anxiety and Pain.  The Depression and Substance Abuse portions were not completed.  He reported great problems reading and writing which caused him great stress in his daily life.  He reported that he was

applying for disability with the assistance of a lawyer.  His condition was stable and under control with medication.  R. 719.  On June 28, he was doing well with the effort to taper the medication.  R. 717.  On July 27, he was referred to LSU for evaluation of his blood pressure.  R. 714-16.  On August 25, it was noted that he had an appointment with LSU.  He was doing well.  R. 712.  He continued to try to taper his medication.  R. 710.

On September 26, 2011, Bell reported that the anxiety was controlled with the medication, which he was "stretching".  R. 707.  There was a physical therapy assessment.  R. 706.  He previously worked on crew boats.  R. 705.  On October 24, Bell reported that he was doing neck exercises.  R. 701.  He had tried, but was not able to reduce the Valium dosage.  R. 699.  On November 21, he reported that he reduced his Valium dosage.  R. 694.  He reported increased pain in his neck possibly because of the change in the weather.  R. 692.  On December 20, 2011, he reported that he was able to do household chores.  R. 690.  The reduction in the dosage for his anxiety medication did not work.  R. 688.

On January 31, 2012, Bell was two weeks late for his appointment, because he was unable to get a ride.  He almost had an anxiety attack.  He had run out of medication.  R. 682.  He was also out of pain medication for about a week.  R. 684.  On March 1, he reported problems with Valium.  He ran out of some medication and was unable to sleep.  R. 680

On April 3, 2012, Bell returned to the Accurate Clinic for Pain and Psych visits.  R. 673-77.  Bell reported that he was able to do things around his house.  His anxiety was well controlled.  R. 675.

\*   \*   \*

On March 12, 2010, Bell was seen for a mental status exam with a consultative clinical psychologist, Victoria Witt, PhD.  R. 439.  On July 7, 2010, he was seen by David Kidder, Ph.D,

a counseling psychologist, for evaluation to determine his eligibility for benefits and development of a rehabilitation plan.  R. 599.  On March 16, 2011, Bell was seen by Miljana Mandich, M.D., a consultative internist, for an examination.  R. 645.  On April 1, 2011, he returned to Dr. Witt for an evaluation.  R.652.

At the March 12, 2010 mental status examination with Dr. Witt, Bell was accompanied by his friend, Jane Thompson.  He had a very long grey beard.  Dr. Witt received no information on Bell or any medical records before the examination.  He described problems with his back, and his inability to read and understand what people said to him.  He went to Accurate Clinic for pain management.  R. 439.  He described multiple car accidents as the source of his neck and back pains.  He tried to do things around his home.  He did his laundry.  Either he or his friend cooked.  His brother helped him with the lawn.  He did not have a car.  He visited his mother.  He did not go out to bars or to dinner.  He did not attend church.  He had problems before Hurricane Katrina.  He worked for about six months in 2009 for an offshore boat company which told him he was too slow, and it stopped calling him for work.  R. 440.  Ms. Thompson gave him rides to the grocery store.  He received help from friends and others.  R. 441.

In the examination, he was alert and orientated.  R. 441.  He was able to maintain an appropriate attention span for the duration (45 minutes) of the evaluation.  R. 442.

A rehabilitation counselor for the Louisiana Rehabilitation Services referred Bell to Dr. Kidder.  Tests were administered.  R. 599.  His full scale IQ fell in the mild mental retardation range of intelligence.  R. 601.  Dr. Kidder concluded that Bell appeared to be mildly mentally retarded and illiterate.  He experienced social phobia and depressive disorder.  He had poor adaptive behavior.  His chance of maintaining gainful employment was quite low.  A work adjustment training program was recommended.  R. 604.  A trial work plan was recommended so

that Bell could be considered for supported employment in an unskilled job.  R. 595-96.  On October 5, 2010, Bell failed to appear for an appointment for an assessment for supported employment.  R. 621.

On March 16, 2011, Bell reported to Dr. Mandich that his chief complaints were high blood pressure, pain in his neck and low back, and nervousness.  R. 645.  He reported that he did maintenance on boats until 2009.  R. 646.  He ambulated without difficulty, without a limp or use of a cane.  He was well developed and nourished.  He had a normal gait and station.  The range of motion in the neck and lower back was normal without guarding.  R. 647.  He had a full range of motion in all joints.  Muscle bulk, tone and strength were preserved in all extremities. He was probably of low average borderline intelligence.  He had an unmistakable smell of alcohol on his breath, but denied alcohol abuse.  R. 648.  He said he drank beer about once a week.  R. 646.  He did not appear intoxicated.  R. 649.  The physical exam was unremarkable. Dr. Mandich noted that a psychological evaluation might be helpful.  R. 649.

On April 1, 2011, Dr. Witt reported that Bell read and signed the consent form. However, midway through the evaluation, he informed her that he did not read.  R. 652.  He was neat, but not very cleanly attired.  He did not appear to have bathed recently.  R. 652.  He had never been hospitalized for psychiatric problems.  R. 653.  He thought he was taking medication for depression but that was incorrect.  R. 654.  His neighbor drove him to the appointment.  R. 655.  He was not very attentive or cooperative and less cooperative than in March 2010.  R. 656. He did not appear to have the ability to sustain effort and persist at a normal pace over the course of a 40 hour workweek.  If he was required to work, he would have difficulties with compliance, attitude, cooperation and transportation.  R. 657.

Dr. Witt concluded:

15

My impression of Mr. Bell after reviewing both of my evaluations and the evaluation written by Dr. Kidder is that Mr. Bell consistently puts forth to me what is minimal effort.  However, reviewing his history and presentation suggests that part of this lack of effort is that he seems very beaten down by life, by Hurricane Katrina, by his poor/inconsistent educational history, his work history, and by his physical and emotional health problems.

Dr. Kidder noted an elevated Beck Depression Inventory which is consistent with Mr. Bell's presentation when I evaluated.  Dr. Kidder's IQ score of 63 is statistically consistent with my report of a low borderline IQ (70-75) which was estimated based on Mr. Bell's presentation during exam.  I really don't have the impression that Mr. Bell was deliberately trying to make himself look worse than he is, i.e., malingering.  My impression is that he is very needy, very dependent, has a poor educational history that interferes with many areas of his life, and has a long self-reported history of depression in addition to a litany of physical health impairments.  The depression is validated by the BDI score reported in Dr. Kidder's evaluation.

R. 659.

e.      **Plaintiff's Appeal**.

**Issue No. 1**.      Whether substantial evidence supports the finding that Bell has past work as a

boat pilot and therefore is not mentally retarded or illiterate?

Bell argues that the ALJ's determination that his past relevant work was that of a boat

pilot is erroneous.  He contends that there was no evidence that Bell performed skilled work.

The Commissioner concedes that the ALJ's finding that Bell's past relevant work equated

to that of boat pilot was erroneous.  Rec. doc. 13 (Memorandum at 5).  Considering the record, it

is not possible to see any basis at all for the ALJ's conclusion that Bell had worked as a boat

pilot.  Rather, the evidence indicates he was an unskilled laborer.  R. 38

The ALJ's erroneous determination impacts his findings.  The ALJ found that Bell's boat

pilot experience did not support a finding that Bell's allegation of depression and mental retardation

were severe impairments.  The ALJ determined that Bell's concentration, persistence and pace were

normal because he had worked as a "boat pilot, a job that requires significant understanding and

comprehension. . . ."  R. 98.  The ALJ found that Bell did not have an impairment or combination of

16

impairments that met or medically equaled the severity of one of the listing impairments.  This was based, in part, on his ability "to perform work activity at a highly skilled level. . . ."  R. 98.  The ALJ found that Bell's work as a boat pilot demonstrated that he "had the knowledge and ability to successfully understand, remember and carry out complex tasks for a lengthy period of time."  R. 100.  While Bell alleged that a friend helped him read, the ALJ responded that the "friend was certainly not present to help claimant in his job of piloting boats."  R. 101.  The ALJ described the knowledge required to pilot boats and found it highly improbable that a truly illiterate person could perform such work.  R. 101-103.  The ALJ concluded that the physical demands of Bell's past work as a ship pilot were within his physical residual functional capacity.  R. 104.

The Commissioner contends that the ALJ's erroneous determination that Bell worked as a boat pilot is harmless error because the ALJ made the alternative step five finding in which the medical-vocational guidelines were applied to find Bell not disabled.

> Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected. . . .  The major policy underlying the harmless error rule is to preserve judgments and avoid waste of time.

Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988).

**Issue No. 2**.    Whether substantial evidence supports the finding that Bell does not meet Listing 12.05C for mental retardation?

Bell argues that at step three he met the criteria for Listing 12.05C (Mental Retardation).  He contends that the primary basis for the ALJ's finding that he did not meet the criteria was the erroneous determination that his past work was that of a highly skilled boat pilot.  Rec. doc. 12 (Memorandum at 23).  The ALJ stated:

> Although, the claimant alleges difficulties in school and an inability to read and write, as previously stated his level of competency, his ability to live independently and to perform work activity at a highly skilled level negates that the claimant was cognitively deficient prior to age 22.

R. 98 (emphasis added).  It is necessary to determine whether, apart from the erroneous finding, there was substantial evidence to support the determination that Bell did not meet the criteria for Listing 12.05C.

> For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.

Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891 (U.S.) (emphasis in original and citing Social Security Ruling (SSR) 83–19).  The burden is on Bell to establish that his impairment meets or equals the Listing requirements.  Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

The requirements for Listing 12.05C are:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when [these] . . . requirements . . . are satisfied.

> *      *      *

> A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05C.  There are three specified criteria that Bell must meet for Listing 12.05C:  (1) onset before age 22 of significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period; (2) a valid verbal, performance, or full scale IQ of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.  20 C.F.R. Part 404, Subpart P, Appendix 1 §§ 12.00A and 12.05C.

Bell contends that:  (1) he was diagnosed with Mild Mental Retardation; (2) the onset age was prior to 18; (3) he is illiterate; (4) testing revealed a Full Scale IQ of 63; and (5) he had the severe impairment of degenerative disc disease.

Prior to the hearing, Disability Determinations Services sought grades, CAT scores, special education information and any IQ scores from the St. Tammany Parish School Board.  It responded that no special education records were found for Bell.  R. 642.  No other information was obtained regarding Bell's school record.

The school records are necessary for the full presentation of whether the onset age for Bell's mental retardation occurred prior to age 22.  It will be recommended that this matter be remanded.  Pursuant to 20 C.F.R. § 404.950(d), the ALJ shall issue subpoenas for all records pertaining to Michael Bell from the St. Tammany Parish school system or any other custodian of Bell's school records.  Bell's counsel shall provide the ALJ with the information necessary for issuance of the subpoenas and the persons upon whom the subpoenas shall be served (such as school systems, schools, dates of attendance, etc.).  The subpoenas and all information received in response to the subpoenas shall be included in the record.

**Issue No. 3**.     Did ALJ err by failing to include non-exertional limitations in the RFC and failing to obtain vocational expert testimony concerning non-exertional limitations?

Bell contends that the record establishes the following non-exertional limitations:  mild mental retardation; social anxiety disorder; depressive disorder; the need to alternate sitting and standing; and the need to lie down throughout the day. Rec. doc. 12 (Memorandum at 24).

> Limitations or restrictions which affect your ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional.

20 C.F.R. § 404.1569a(a).   Non-exertional limitations are present where there is difficulty functioning because the claimant is nervous, anxious or depressed.  Id. at § 404.1569a(c).  If there are

non-exertional limitations, an ALJ is required to obtain testimony from a vocational expert.  When non-exertional limitations are established, a disability determination cannot be made solely on the basis of the vocational guidelines.  Martin v. Heckler, 748 F.2d 1027, 1034 (5th Cir. 1984).  Bell contends that the ALJ failed to obtain testimony from a vocational expert concerning these alleged non-exertional limitations.

The Commissioner responds that there is substantial evidence to support the ALJ's findings that:  (1) Bell retained the RFC to perform the full range of medium work; (2) he did not have a severe functional deficit due to mental retardation; (3) his testimony concerning his non-exertional limitations was not credible; and (4) he did not have non-exertional impairments.

On March 12, 2010, the psychologist, Dr. Witt, did not diagnosis Bell with a mental disorder. R. 442.  A year later on April 1, 2011, Dr. Witt diagnosed Bell with anxiety disorder (not otherwise specified), and ruled out personality disorder (dependent type).  The Global Assessment Functioning was placed at 45-50.  R. 657.  This indicates serious impairment in social or occupational functioning.  Dr. Witt concluded that Bell did not appear to have the ability to sustain effort and persist at a normal pace over the course of a routine 40 hour work week, and if he was required to work full time, he would have difficulties with compliance, attitude, cooperation and transportation. R. 657.

The ALJ found that the evidence negated Dr. Witt's conclusion, and he gave her opinion little weight.  R. 98.  The issue is whether, excluding the erroneous finding that Bell worked as a boat pilot, there is substantial evidence to support the ALJ's decision to give little weight to Dr. Witt's conclusion.

> In applying the substantial evidence standard, we may not reweigh the evidence in the record, nor try the issues *de novo,* nor substitute the Court's judgment for the Secretary's, even if the evidence preponderates against the Secretary's decision. This is so because substantial evidence is less than a preponderance but more than a scintilla.

20

Bowling v. Shalala. 36 F.3d 431, 434 (5th Cir. 1994)(quotation marks, brackets and citations omitted and emphasis added).

The ALJ referred to Bell's performance of normal daily activities despite his alleged depression and anxiety.  R. 98.  On March 16, 2011, Dr. Mandich reported that Bell engaged in all activities of daily living including driving.  R. 649.

The ALJ referred to the absence of medical records of mental health treatment even though Bell testified that he was seen at a mental health center once a month.  R. 98.  At the August 24, 2010 hearing, Bell testified that he saw a psychiatrist once a month and he saw someone he could talk to about his problems.  R. 28.  Bell may have referred to the procedure at Accurate Clinic where a single office encounter was divided into two visits:  one for pain; and one for mental health.  Supra at 11-13.  It is correct, however, that he did not see a psychiatrist.

As noted by the ALJ, the April 3, 2012 medical records from Accurate Clinic reported that Bell was able to do things around his home and his anxiety and depression were controlled.  R. 98 and 675.  The ALJ cited and Bell testified to his contact with family and neighbors and the help they provided him.  R. 15 and 45-46.  He also reported similar contact with family and neighbors to Dr. Kidder.  R. 600.

The ALJ cited Bell's allegation of illiteracy.  Although the ALJ responded with the erroneous finding that Bell had worked as a boat pilot, the Commissioner notes that Bell's illiteracy was not a new impairment.  It did not prevent him from working at unskilled jobs from the time he was 18 until as recently as 2009 and making as much as $39,000 per year.  Rec. doc. 13 (Memorandum at 6) and R. 280.

Because the ALJ's erroneous finding that Bell's past relevant work equated to that of a boat pilot so permeated the analysis of whether non-exertional limitations should have been included in the RFC, it cannot be determined whether there is substantial evidence to support the ALJ's decision

to give little weight to Dr. Witt's conclusion.  The erroneous finding was not harmless error.  The matter should be remanded for that reason.

On remand the ALJ shall reconsider without any reference to the erroneous finding: (1) the determination of the RFC; (2) the issue of inclusion of non-exertional limitations in the RFC and the need for expert vocational testimony; (3) the weight to be given Dr. Witt's opinion; and (4) the weight to be given the opinions of Drs. Kidder and Mandich.  Because all parties agree that the ALJ erred in consideration of the past relevant work and the absence of any basis for such a finding, the Commissioner shall assign this matter to another ALJ on remand.

**Issue No. 4**.    Did the ALJ err in finding that Bell had the RFC to perform the full range of medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c)?

Bell argues that because the Commissioner concedes that he does not have past relevant work as a boat pilot, the ALJ's RFC finding is not supported by substantial evidence.  Rec. doc. 15.  The ALJ found that Bell had the RFC to perform the full range of medium work.  R. 104-06.  Bell's argument relates to his allegations that he is unable to work because of his mental retardation, depression and anxiety.  These allegations were considered under issue no. 3.

**Issue No. 5**.    Whether Grid Rule 203.18 directs a finding of not disabled?

In the alternative, at step five the ALJ used the medical-vocational guidelines (Grid Rules) to determine that, considering Bell's age, education, work experience and RFC, there were other jobs that exist in the national economy that Bell can perform.  R. 107.

In Heckler v. Campbell, 461 U.S. 458, 103 S.Ct. 1952, 1957 (1983), the Supreme Court found that the Secretary's reliance on medical-vocational guidelines was consistent with the Act.  In Scott v. Shalala, 30 F.3d 33 (5th Cir. 1994), the Fifth Circuit stated:

> [T]he Secretary may rely on the medical-vocational guidelines to establish that work exists for a claimant only if the guidelines' evidentiary underpinnings coincide exactly with the evidence of disability appearing on the record.

Id. at 34 (citations and quotation marks omitted).

If non-exertional limitations are established, disability cannot be determined solely on the basis of the guidelines.  Martin, 748 F.2d at 1034.  It will be recommended that the matter be remanded, in part, to reconsider the issue of inclusion of non-exertional limitations in the RFC and the need for expert vocational testimony.

The ALJ's conclusion at step five was based on the finding that Bell had the residual functional capacity for the full range of medium work.  R. 107.  Dr. Witt, however, found that Bell did not appear to have the ability to sustain effort and persist at a normal pace over the course of a 40 hour work week.  If he was required to work, he would have difficulties with compliance, attitude, cooperation and transportation.  R. 657.  Dr. Witt did not have the impression that Bell was malingering.  R. 659.  The ALJ gave Dr. Witt's opinion little weight.  R. 98.  It will be recommended that the matter be remanded, in part, to reconsider the weight assigned to Dr. Witt's opinion.

Until the inclusion of non-exertional limitations, the weight to be assigned to Dr. Witt's opinion and other matters which are the subject of the recommendation of remand are resolved, the application of the Grid Rules cannot be determined.

## **RECOMMENDATION**

IT IS RECOMMENDED that:

1.      Bell's motion for summary judgment (Rec. doc. 12) be GRANTED in PART and DENIED in PART; (2) the Commissioner's cross-motion for summary judgment (Rec. doc. 13) be DENIED; and (3) pursuant to 42 U.S.C. § 405(g), the matter be remanded.

2.      The ALJ be required to issue subpoenas for all records pertaining to Michael Bell from the St. Tammany Parish school system or any other custodian of Bell's school records; Bell's counsel be required to provide the ALJ with the form of the subpoenas and the persons upon whom the subpoenas shall be served; and the ALJ be required to file in the record the subpoenas and all information received in response to them.

3.      Without any reference to the erroneous finding that Bell's past relevant work equated to that of a boat pilot, the ALJ shall reconsider: (a) the determination of the residual functional capacity; (b) the issue of inclusion of non-exertional limitations in the residual functional capacity and the need for expert vocational testimony; (c) the weight to be given the opinions of Drs. Witt, Kidder and Mandich; and (d) and the finding that Bell was not under a disability, as defined in the Act, from July 1, 2009, through the date last insured, December 31, 2011.

4.      The Commissioner assign this matter to another ALJ on remand.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 4th day of November, 2014.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**